GOLDBERG & WOLF, LLC
By: Warren S. Wolf, Esquire
1949 BERLIN ROAD, SUITE 201
CHERRY HILL, NEW JERSEY 08003
(856) 651-1600
Attorneys for Defendant,
David A. Plastino

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLAVNIA

| | | |
|---|---|---|
| SEAN T. NICHOLAS, | : | |
| Plaintiff, | : | Case No. 23-cv-1259 |
| v. | : | |
| DAVID A. PLASTINO, | : | **ORAL ARGUMENT REQUESTED** |
| Defendant. | : | |

## DECLARATION OF DAVID A. PLASTINO IN OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN CASE TO ENFORCE SETTLEMENT

David A. Plastino, hereby declares as follows:

1.    I am the Defendant in the above-captioned matter. I have personal knowledge of the facts set forth herein and submit this declaration in opposition to Plaintiff's Motion to Reopen this Case to Enforce Settlement.

## INTRODUCTION

2.    At the settlement conference, the parties agreed on two broad elements of a settlement agreement: (1) First, that a piece of art( titled "The Children" by Titus Kaphar, hereto referred to as "CTK") held by me as collateral would be jointly sold through auction and the net sale proceeds of the sale would be shared by the Plaintiff and me in a formula agreed to at the time and (2) that other art being held by me as collateral would be returned to the Plaintiff in due course once a final settlement agreement had been reached.

3.  Additional critical terms and necessary elements specifically related to successful implementation of these two broad terms were left open for negotiation.

4.  After extensive negotiations, we have been unable to agree on a settlement agreement that includes material terms acceptable to both parties.

5.  At the Plaintiff's recommendation, the parties agreed to use Christie's as the auction house.

6.  We also agreed that Christie's would transfer all sale proceeds directly to my attorney for later allocated redistribution to both parties.

7.  Recently, on August 29, 2023, after over two months of active negotiations, I was informed by the Plaintiff's attorney, without any evidence of its veracity, that this agreed upon material term, is not possible because Christie's has refused to do it.

8.  I was refused any opportunity to communicate with Christie's to determine if an alternative solution exists that is acceptable to both parties.

9.  This inability to enforce a most fundamental term created a mutual mistake by both parties (relying on a third party to do something to facilitate an agreed upon critical term before asking them if they would in fact do it) thereby rendering the settlement unenforceable.

10.  Plaintiff agreed that the proposed settlement entitled me to both a fixed (return of my $124,582 paid for undelivered art) and variable portion (40% of the any remaining sale proceeds after deducting my $124,582) of the net sale proceeds of the CTK.

11.  Per the formula, this amounts to more than half of the estimated net sale proceeds from the auction.

12.     Given that there exists a variable portion which is dependent on the terms of the sale, I understood that I had acquired an economic interest in obtaining the highest net sale proceeds from the sale.

13.     I agreed to acquire an equitable owner's interest that gives me the right to provide input into the negotiations of the terms of sale with Christie's and the right to be a signatory to the contract to verify the terms and prove my consent.

14.     I have repeatedly asked the Plaintiff to provide any evidence concerning his negotiations to sell the CTK through Christie's, but he has refused.

15.     In fact, I have no evidence other than his assertions that he has ever been in negotiations with Christie's.

16.     Stretching the limits of credulity, Plaintiff has stated through his attorney that all negotiations with Christie's have been verbal and that there is no written evidence of any negotiations.

17.     I have legitimate questions concerning the terms of any Christie's contract (if it even exists) that I would like answered and documented before signing a settlement agreement, such as  (a) what is Christie's compensation, (b) will any party, including the Plaintiff, be separately compensated from the gross sale proceeds in any way that would affect the net sale proceeds, (c) will the CTK be returned by Christie's to me and not the Plaintiff if the sale is cancelled for any reason?

18.     Basically, the Plaintiff is asking me to take his word for it and sign the proposed settlement agreement before seeing anything related to the Christie's sale contract.

19.   His refusal to permit me to have joint contractual control with Christie's, any direct communication with Christie's or be provided with any evidence relating to the terms of the proposed sale is a material term not agreed to by the parties.

20.   Given my prior experience of being swindled by the Plaintiff, and his public record of having been found liable in court of swindling others, a reasonable concern I have is that all of these negotiations are possibly a disingenuous attempt by the Plaintiff to swindle me again through his unilateral settlement terms which will separate me from my collateral, possibly never receiving any auction sale proceeds and exposing myself to being sued by him in a second lawsuit for any purported damage to the subject artwork during my holding of it the last five years.

21.   To understand this context, a summary of the background facts is needed.

## BACKGROUND FACTS

22.   Plaintiff admits I purchased eight pieces of art from him for $128,082 and after months of requests for delivery to me of the fully paid for art, he refused to deliver any of them ("Defendant Paid but Undelivered Art").

23.   He never explained to me why he could not deliver the Defendant Paid but Undelivered Art and never returned any of the monies I paid him.

24.   The Defendant Paid but Undelivered Art is itemized in the top section of a Settlement Agreement dated July 30, 2018, signed by the parties and attached to the Complaint as Exhibit A ("2018 SA"). A true copy of the 2018 SA is attached hereto to as Exhibit A.

25.   The 2018 SA released both parties from any claims related to any actions taken by either party prior to the signing of the 2018 SA.

26.     Pursuant to the 2018 SA, Plaintiff agreed to either deliver all the Defendant Paid but Undelivered Art to me or pay me $124,582 by March 31, 2019.

27.     To secure his obligations in the 2018 SA, Plaintiff agreed to provide me with 13 pieces of art, which included CTK, as collateral ("Collateral Art").

28.     The Collateral Art is identified in the bottom section of the 2018 SA.

29.     After the parties agreed to and signed the 2018 SA, Plaintiff authorized his sister, who was in possession and control of the Collateral Art at that time, to release the Collateral Art to me, which she did.

30.     I never had physical possession nor control of the Collateral Art prior to signing the 2018 SA.

31.     Also, the Plaintiff's sister had a key to and legal access to the Plaintiff's residency because she was living part-time with him.

32.     Contrary to Plaintiff's assertions, neither the Plaintiff's sister nor I ever entered the Plaintiff's house without his permission, nor did I ever misappropriate any of his art.

33.     Plaintiff has failed to comply with the 2018 SA by never paying me the required $124,582 or providing me with any of the Defendant Paid but Undelivered Art.

### THE 2023 SETTLEMENT

34.     One of the pieces of the Collateral Art, "The Children" by Titus Kaphar ("CTK") is believed to be the most valuable piece by far.

35.     Although I am not in the art business, Plaintiff is in the art business having owned galleries.

36.     Plaintiff advised that works by the artist Titus Kaphar have recently skyrocketed in value.

37. One of the Defendant Paid but Undelivered Art was another Titus Kaphar named "Shredding the Truth" which was exhibited in The National Portrait Gallery in Washington, D.C. and has also skyrocketed in value. See exhibit A.

38. By the Plaintiff never delivering that piece to me, I was denied a substantial economic benefit.

39. Plaintiff advised that CTK may have increased in value to an estimated value of $300,000 or higher if sold at an auction.

40. In reliance upon Plaintiff's representations, I agreed to settle our claims at the settlement conference on June 15, 2023, with the CTK to be sold and the net (as opposed to gross proceeds before sale expenses) sale proceeds divided as follows:

    (a) The first $124,582 paid to me and

    (b) The balance would be split 60% to Plaintiff and 40% to me.

41. Due to Plaintiff having swindled me and others before and in addition to other broken promises and agreements by Plaintiff as explained below, I required that I at a minimum have joint contractual control with any auction house used to sell the CTK and that all sale proceeds be sent to my attorney to divide up pursuant to the above formula.

42. Plaintiff agrees that a material term of the settlement was for all of the CTK net sale proceeds would be sent by Christie's to my attorney's trust account.

43. Plaintiff has refused to allow me to have a joint contractual relationship with the auction house despite repeated demands for same.

44. Plaintiff refused to provide my attorney with any documents, emails contracts, etc. exchanged between himself and the auction house despite repeated demands by my attorney.

45.     Plaintiff has refused to disclose whether any other party, including himself, is receiving any separate compensation from the gross sale proceeds (finder's fees, commissions, etc.) despite my repeated requests for information.

46.     Plaintiff has refused to identify the name of the seller he has identified to the auction house, whether himself, one of the galleries he engages in or another entity/ individual.

47.     Plaintiff's counsel has advised that the Plaintiff seeks to sell the CTK through the auction house known as Christie's.

48.     Plaintiff has refused to provide me with his contact at Christie's so I can attempt to get verification that anything Plaintiff has advised us about the auction process is true.

49.     I became frustrated with the Plaintiff's lack of transparency and delays, so I offered other simpler settlement solutions that did not involve relying upon the actions of a third party (i.e., Christie's).

50.     I offered to pay a lump sum to the Plaintiff for the provenance documents and legal ownership of the Collateral Art would then transfer to me and we would provide mutual releases of further claims.

51.     Another alternative settlement proposed by me was the signing of a new collateral agreement whereby the Plaintiff would get a finite period to make a specified payment to me, and if he did, I would deliver all the Collateral Art to him.

52.     All the offers were rejected by the Plaintiff.

53.     I dispute Plaintiff's accusation that I intend to make derogatory remarks about him to Christie's.

54.     To the contrary, my only goal is to limit my risk that I will not lose the Collateral Art without receiving my share of the proposed sale proceeds.

55.     Plaintiff's counsel has advised that Christie's refuses to honor the material terms of the parties' settlement requiring the sale proceeds be sent to my attorney.

56.     Instead, Plaintiff's counsel claimed, as recently as August 29, after months of negotiations, that Christie's has advised his client that only $124,582 of the sale proceeds can be sent to me or my attorney and the balance must go to the Plaintiff's personal account, not even to his own lawyer's escrow account.

57.     This is a critical term that I never agreed to and is in direct opposition to what was previously agreed to by the Plaintiff.

58.     Further, he provided no evidence that this is in fact Christie's policy.

59.     Again, given my prior experience of being swindled by the Plaintiff, and his public record of having been found guilty in court of swindling others, I cannot trust Plaintiff to ever send the 40% to me.

60.     I recently became aware that during our negotiations the Plaintiff spent extensive time outside of the United States attempting to establish an art gallery overseas.

61.     This seems to have caused delays in communication between the Plaintiff and his lawyer and could be one of the reasons the negotiations lagged.

62.     It also raises the question of whether the Plaintiff is trying to shift assets overseas so that they would be unattachable if any future judgements are awarded against him.

63.     In that the Plaintiff has denied me the opportunity to be a signatory to a contract of sale with Christie's or at the minimum allowing me to review the terms of a proposed contract between the Plaintiff and Christie's to provide input and determine if I agree with said terms negotiated by the Plaintiff before signing a settlement agreement, I am exposing myself to potentially catastrophic outcomes.

64.     For example, the Christie's contract could possibly give the Plaintiff the right to cancel the auction and have Christie's deliver the CTK back to him rather than me, thus divesting me of the most valuable piece of collateral and putting me at extreme risk of never receiving anything from the Plaintiff.

65.     Plaintiff seeks to unilaterally change one of the most critical elements and have a portion of the sale proceeds sent directly to his personal account.

66.     With this proposed change, if I delivered the twelve pieces of Collateral Art to the Plaintiff prior to the CTK being sold, I put myself at risk of illegitimately losing some of my collateral.

67.     Although I acknowledge that the bulk of the Collateral Art value is in the CTK, nevertheless, if the Plaintiff cancelled the CTK sale and repossessed the CTK, or never sent to me the variable portion of the CTK sale proceeds that the Plaintiff claims must be sent to him personally to effectuate the CTK sale, I would be damaged by having previously given up the 12 other collateral pieces before receiving my agreed upon portion of the sale proceeds.

68.     I expressed this concern to the Plaintiff and only recently did Plaintiff agree to allow me to hold the twelve other works of the Collateral Art until I received my portion of the proceeds from the sale of the CTK.

69.     The twelve other works of Collateral Art are of reduced value compared to CTK.

70.     In the first draft of the proposed settlement agreement prepared by Plaintiff's counsel, the Plaintiff inserted a unilateral term that he has the right to lodge a damage claim after the Collateral Art is transferred to him, allowing him to exclusively assess the value of the damage and have any such damage claims deducted from the CTK sale proceeds.

71.     I requested that the Plaintiff or his authorized representative physically inspect the Collateral Art before I transferred it to him so that we could reach an agreement as to whether any damage occurred to the Collateral Art while in my possession. He refused.

72.     I have concerns that the Plaintiff will fabricate a damage claim on the Collateral Art, although no damage to the Collateral Art occurred while in my possession.

73.     An additional reason I required the CTK be sold jointly and not just in Plaintiff's name alone is because Plaintiff's judgment creditors may seek to levy on the auction proceeds.

74.     For example, I found a judgment against Plaintiff for $320,752.50 which indicates it includes punitive damages and disgorged commissions for Plaintiff failing to pay an artist for her art. Attached as Exhibit B is a copy of an Order entered on January 27, 2020, in a case captioned <u>Clark v. Castor and Pollux, Sean T. Nicholas et al</u>, Index No. 655446/2017 filed in the Supreme Court of New York.

75.     Additionally, Plaintiff failed to repay $80,000 I loaned him.

76.     The $80,000 loan is not part of this lawsuit but is disclosed to further show why it would be unreasonable to require me to allow Plaintiff to control the other Collateral Art before I am paid my portion of the proceeds from the sale of the CTK.

77.     I also need to advise the court that the current settlement agreement does not provide any windfall to me.

78.     The Defendant Paid but Undelivered Art, included a different yet highly valuable Titus Kaphar piece named "Shred of Truth" and included two pieces by Damien Hirst, one of the most internationally celebrated artists of the last 50 years.

79.     The "Shred of Truth," which was exhibited in a critically acclaimed solo show by the artist at the National Portrait Gallery in Washington, D.C., has also ballooned in value during the last five years.

80.     It is reasonable to assume that I would be well ahead of any potential proceeds I might receive from the proposed sale of the CTK, if in the first place, the Plaintiff had delivered to me all the Defendant Paid but Undelivered Art which, if sold, I would be entitled to 100% of the proceeds. See Exhibit A.

81.     Given my prior history of being defrauded by the Plaintiff and his public record of defrauding others, I am asking the Court if it chooses to enforce a settlement, to only enforce a settlement which includes, at a minimum, the following material terms: (1) I be recognized as a joint seller of the CKT therefore allowing me to co-negotiate and ultimately have the right to be a co-signatory to any sale contract with any auction house, (2) As already agreed to, all of the proceeds of any agreed upon sale of the CKT are sent directly to my attorney to hold in trust until both sides consent to the appropriate distribution pursuant to the settlement and (3) Plaintiff or his authorized representative inspects the Collateral Art prior to transfer of said art to the Plaintiff and if it is in satisfactory condition to the Plaintiff, then the Plaintiff releases me from any claims of damage while the art was in my possession.

82.     If this is not possible, then the Court should find that there was no settlement agreement reached between the parties and (a) Plaintiff's Motion should be denied whereby the parties can complete the settlement on their own or (b) the case reopened to be litigated.

I declare under the penalty of perjury that the foregoing statements made by me are true and correct.

Dated: 9/26/2023

David A. Plastino, Defendant

# Exhibit A

7/30/2018

<u>Agreement between Sean T. Nicholas(SN) and David A. Plastino(DP) to settle all claims</u>
<u>between the Parties concerning the art listed in this agreement</u>

Both parties agree to release each other from all claims between them concerning the art listed below.
Art Purchased and paid for by DP but undelivered:

| Artist | Title | Purchase Price | |
|---|---|---|---|
| Stacey Leigh | "Squirt" | $6666 | |
| Stacey Leigh | "More Human than Human" | $6666 | |
| Stacey Leigh | "Angela from Alabama" | -0- | included because bought |
| three prints | | | |
| Damien Hirst | "Mickey and Minnie" 2 prints | $26 | |
| ,000 | | | |
| Titus Kaphar | "Shred of Truth" | $42,750 | |
| Reena Spaulings | "Dans la rue(56 Leonard) | $35,000 | |
| Jeanette Hayes | " Good Times" | $2,000 | |
| Jeanette Hayes | " Despicable Jeanette" | $8,000 | |
| Total | | $128,082 | |

In total compensation to DP and complete satisfaction of all claims by DP against SN in reference to the above listed art purchased by DP but still undelivered, SN has offered the following paintings to be given to DP as collateral to assure SN's fulfilling one of the options listed on page 2 of this agreement :

Collateral

| Artist | Title/Description |
|---|---|
| Shepard Fairey | print, portrait of a woman |
| Titus Kaphar | original oil and tar, "The Children" 2012 |
| Murakami | 2 posters, homage to francis bacon, study of Isabel Rawsthorne |
| Faile | print of a Madonna |
| Faile | print, dirty dancers, 50% off |
| Faile | print seduction of the mask |
| Dot Dot Dot | print  Napolean |
| Dot dot dot | print "Handgun" |
| Judith Supine | print of neon colored woman with white glasses |
| Bast | print  Lady Gaga |

| Miss Bugs | Geisha with surgical blades |
| Harlan Miller | don't let the bastards cheer you up |
| Damian Hirst | Polka dots with white background |

Up to and including March 31, 2019, SN has the following option to satisfy all claims DP has relative to the above referenced art and for SN to receive back the art given to DP as collateral

1-Deliver ALL the art DP purchased or

2- Pay DP $124,582

SN has the right to sell any collateral piece, except the Titus Kaphar and Miss Bugs, and deliver the proceeds of sale to DP before 3/31/2019 as payment toward the 124,582.


David A. Plastino
7/31/2019

Sean T. Nicholas
7/31/18

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK



---

ALLISON CLARK a/k/a LALA ABADDON,

Plaintiff,

-against-

CASTOR AND POLLUX LIMITED
LIABILITY COMPANY d/b/a CASTOR
GALLERY, SEAN T. NICHOLAS, and
JUSTIN A. DEDEMKO,

Defendants.

---

Index No.: 655446/2017

Hon. Charles E. Ramos, JHO

**[PROPOSED] ORDER AND JUDGMENT**

PAPERS RECEIVED

JAN 2 7 2020

NYS SUPREME COURT - CIVIL
ORDER SECTION - RM 119A

WHEREAS, on April 4, 2019, the Honorable Anthony Cannataro, J.S.C., entered a

Decision and Order (NYSCEF Doc. No. 120) disposing Motion Seq. No. #006 and holding, *inter*

*alia*, "that the answers of defendants are stricken" and "[t]he only remaining issue in this case is

damages"; and

WHEREAS, the Court's Decision and Order entered on April 4, 2019 "ORDERED that a

Judicial Hearing Officer ('JHO') or Special Referee shall be designated to determine the following

issues of fact: (1) Actual, compensatory, consequential, exemplary and special damages; (2)

Restitution for unjust enrichment; (3) Punitive damages; (4) Fees, expenses, costs, and interest;"

and further "ORDERED that the powers of the JHO/Special Referee shall not be limited beyond

the limitations set forth in the CPLR"; and

WHEREAS, pursuant to the Court's reference, an inquest was held on July 17, 2019 before

the Honorable Charles E. Ramos, JHO, to hear and determine the foregoing issues of fact (Motion

Seq. No. #007); and

WHEREAS, on September 18, 2019, Hon. Charles E. Ramos, JHO, entered the annexed Decision / Order (NYSCEF Doc. No. 139) disposing the foregoing reference and held that: "Ms. Clark shall recover: $44,750, consisting of $39,700 in compensatory damages and $5,050 in disgorged commissions, together with $16,110 in prejudgment interest computed at a rate of nine percent per annum from August 21, 2015 through August 21, 2019; $14,500 in appreciation damages, together with $3,712.24 in prejudgment interest computed at a rate of nine percent per annum from October 16, 2016 through August 21, 2019; and $500 in unpaid sale proceeds, together with $200.11 in prejudgment interest computed at a rate of nine percent per annum from March 11, 2015 through August 21, 2019"; and

WHEREAS, the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019 further held that: "Based on the foregoing, Ms. Clark shall have judgment against Defendants for $59,750, together with $20,022.35 in pre-judgment interest as set forth above; $158,800 in punitive damages; and $82,00.15 in reasonable attorney's fees, costs, and expenses, for a total judgment amount of $320,572.50, and post-judgment interest on the total sum at nine percent per annum, or $79.05 per diem"; and

WHEREAS, on September 9, 2019, Plaintiff's counsel informed Hon. Charles E. Ramos, JHO, by letter (NYSCEF Doc. No. 137) that Plaintiff Allison Clark had recovered some of the artworks at issue from Defendants; and

WHEREAS, the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019 (NYSCEF Doc. No. 139) held that: "In order to be settled herein, counsel for Plaintiff may adjust the terms of the order and judgment to be settled to reflect such returns"; and

WHEREAS, on September 9, 2019, Plaintiff's counsel filed an Amended Proposed Order and Judgment (NYSCEF Doc. No. 138) adjusting the relief sought to reflect such returns; and

WHEREAS, on September 23, 2019, Plaintiffs' counsel submitted a Notice of Settlement of Judgment (NYSCEF Doc. No. 141) and [Proposed] Order and Judgment (NYSCEF Doc. No. 142) for signature by Hon. Anthony Cannataro, J.S.C.; and

WHEREAS, on December 10, 2019, Hon. Charles E. Ramos, JHO, directed that the Clerk of the Court requested that Plaintiff submit a proposed judgment for signature by Hon. Charles E. Ramos, JHO; and

WHEREAS, upon due consideration and good cause appearing therefor;

UPON the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019 (NYSCEF Doc. No. 139); it is hereby

ADJUDGED AND ORDERED, that pursuant to the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019, Plaintiff Allison Clark has judgment and shall recover against Defendants Castor and Pollux Limited Liability Company d/b/a Castor Gallery, Sean T. Nicholas, and Justin A. DeDemko, jointly and severally, all the following sums:

1. **$12,141.97** for compensatory damages for the artworks "Liminal Dwelling" (2015), "Over Spilled Milk" (2015), "The Dark Matter of Gravitrons" (2015), "How Ironic Is This?" (2015), and "( ͡° ͜ʖ ͡°)" (2014), together with pre-judgment interest at nine percent per annum pursuant to CPLR 5001(a) forward from August 21, 2017, as a single reasonable intermediate date pursuant to CPLR 5001(b), in the amount of $_____, to be computed by the Clerk of the Court; and

2. **$6,000** for compensatory damages for the artwork "Metaverse" (2015), together with pre-judgment interest at nine percent per annum from August 21, 2015 forward pursuant to CPLR 5001(a), in the amount of $_____, to be computed by the Clerk of the Court; and

3. **$3,250** for sale commissions, together with pre-judgment interest at nine percent per annum from August 21, 2015 forward pursuant to CPLR 5001(a), in the amount of $_____, to be computed by the Clerk of the Court; and

4. **$2,000** for consequential damages and restitution for the appreciation in value of "Metaverse" (2015), together with pre-judgment interest at nine percent per annum pursuant to CPLR 5001(a) forward from October 16, 2016, as a single reasonable intermediate date pursuant to CPLR 5001(b), in the amount of $_____, to be computed by the Clerk of the Court; and

5. **$500** for sale proceeds for the artwork "If the Sun Were to Spontaneously Combust" (2015), together with pre-judgment interest at nine percent per annum from March 11, 2015 forward pursuant to CPLR 5001(a), in the amount of $_____, to be computed by the Clerk of the Court; and

6. **$158,800** for punitive damages;

7. For a total judgment amount of $_____, to be computed by the Clerk of the Court by adding all of the foregoing sums, including prejudgment interest; and

8. Post-judgment interest on the total sum of the judgment at nine percent per annum pursuant to CPLR 5004 in the amount of $_____ per diem, to be computed by the Clerk of the Court; and it is hereby

ADJUDGED AND ORDERED, that Plaintiff Allison Clark shall have execution therefore; and it is hereby

ADJUDGED AND ORDERED, that pursuant to the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019 (NYSCEF Doc. No. 139), Plaintiff Allison Clark has

judgment and shall recover against Defendant Justin A. DeDemko, individually, all the following sums:

1.  **$1,800** for sale commissions, together with pre-judgment interest at nine percent per annum from August 21, 2015 forward pursuant to CPLR 5001(a), in the amount of $_____, to be computed by the Clerk of the Court, for a total judgment amount of $_____, to be computed by the Clerk of the Court; and

2.  Post-judgment interest on the total sum of the judgment at nine percent per annum pursuant to CPLR 5004 in the amount of $_____ per diem, to be computed by the Clerk of the Court; and it is hereby

ADJUDGED AND ORDERED, that Plaintiff Allison Clark shall have execution therefore; and it is hereby

ADJUDGED AND ORDERED, that pursuant to the Decision / Order of Hon. Charles E. Ramos, JHO, entered on September 18, 2019 (NYSCEF Doc. No. 139), Plaintiff's counsel Quinn Emanuel Urquhart & Sullivan, LLP has judgment and shall recover against Defendants Castor and Pollux Limited Liability Company d/b/a Castor Gallery, Sean T. Nicholas, and Justin A. DeDemko, jointly and severally, all the following sums:

1.  **$82,000.15** for reasonable attorney's fees, costs, and expenses incurred through July 15, 2019; and

2.  Post-judgment interest on that sum at nine percent per annum pursuant to CPLR 5004 in the amount of $_____ per diem, to be computed by the Clerk of the Court; and it is hereby

ADJUDGED AND ORDERED, that Quinn Emanuel Urquhart & Sullivan, LLP shall have execution therefore; and it is hereby

ADJUDGED AND ORDERED, that all relief not granted herein is denied.

JUDGMENT SIGNED AND ENTERED THIS 24ᵗʰ DAY OF January 2020.

_____
Hon. Charles E. Ramos, JHO